LUBLIN v. STEWART, HOWE & MAY CO. et al.

(Circuit Court, D. New Jersey.  June 12, 1896.)

1. PATENTS—INVENTION—DRESS STAYS.
      The Bray patent, No. 440,246, for an improvement in dress stays, which
   is designed to prevent the steels from breaking their covering and work-
   ing out longitudinally, is void for want of invention, in view of the Curtis
   patent, No. 243,519, for an improvement in the back of corsets.

2. RES JUDICATA—QUESTIONS LITIGATED—PATENT CASES.
      Where, in a patent infringement suit, defendants did not deny the valid-
   ity of the patent, but claimed a license under it to sell the patented articles,
   and the existence of such license was the only issue litigated, held, that a
   decision in favor of complainant did not estop defendants from ques-
   tioning, in a subsequent suit, the validity of the patent.

This was suit in equity by Oscar Lublin against the Stewart,
Howe & May Company and others for alleged infringement of let-
ters patent No. 440,246, issued November 11, 1890, for an improve-
ment in dress stays.

C. E. Mitchell and H. B. Brownell, for complainant.
William A. Jenner and C. Godfrey Patterson, for defendants.

GREEN, District Judge.  The complainant, who claims to be the
owner of an undivided one-half interest in letters patent No. 440,-
246, files this bill of complaint against the defendants to enjoin
them from further infringement of the letters patent in question.
The letters patent were granted on or about November 11, 1890, to
one Morris P. Bray, for an "improvement in dress stays."  The pat-
entee, Bray, who was the owner of the other undivided half inter-
est, is made a party defendant, because, as it is stated in the bill
of complaint, he refused to become a party complainant in this ac-
tion.

The bill of complaint contains, among other things, an allega-
tion of the grant of the letters patent to Bray; the assignment by
him to the complainant of an undivided half interest therein on or
about May 2, 1891; the formation of a partnership between Bray
and the complainant to manufacture and sell dress stays under the
letters patent; the actual manufacture and sale thereof under the
partnership agreement, and the manufacture and sale of the iden-
tical dress stays by all the defendants other than Bray, in direct
violation of the rights of the complainant, and in infringement of
the letters patent, to the great pecuniary loss of the complainant;
and a prayer for an injunction, an accounting, and for such other
equitable relief as should be pertinent to the issue.

The defendants, at first jointly answering, made no attack upon
the validity of the letters patent, but, practically admitting such
validity, based their defense upon an alleged legal right to make
and vend the stays in question, claiming that by virtue of various
mesne assignments from Bray, the patentee, to them, or to some
of them, they had acquired an interest in or a title to the letters

patent. Upon this allegation issue was joined and testimony was taken. During its progress, all the defendants except Bray moved the court for leave to file an amended answer, by which they changed the ground of their defense very materially. As heretofore stated, in their original answer no attack upon the validity of the letters patent in question was suggested. But by their amended answer that validity was seriously drawn in question, and it was asserted that the invention thereby protected was wholly wanting in patentable novelty, and that it was in fact fully anticipated by an invention made by one Curtis for an improvement in corsets, and for which letters patent had been granted to him June 28, 1881. Under the somewhat peculiar circumstances which surrounded this case, although not without hesitation, leave to file the amended answer was granted, and thus was raised what has become the chief issue in this litigation.

The patent involved in this suit is for certain "new and useful improvements in dress stays." The patentee carefully limits his invention by the words of description. He says: "My present improvement has nothing to do with the construction of dress stays proper, but pertains solely to the securing of the ends of the steels (stays) to the outer covering." "Heretofore the main difficulty with twin stays has been owing to the longitudinal displacement of the steels for want of a proper fastening device, but my invention overcomes this difficulty, and at the same time leaves the stay flexible throughout its entire length." The longitudinal displacement of the stay to which the patentee refers consists in nothing more or less than the movement of the stay in the cover or pocket in which it is confined on the corset or dress waist, caused by the movement of the body of the wearer. Such movement of the body, communicating pressure to the stay, causes it to bend, shortening its length for the time. Upon reaction of the body, the pressure upon the stay would be relaxed, and its forced curvature would cause it to spring back to its original longitudinal position with considerable force. This would tend to cause the end of the stay to strike against the top or bottom of the covering or pocket in which it was placed, with the necessary and consequent result of a wearing away or a rupture, or at least a fraying of the covering fabric, permitting the protruding end of the stay to penetrate the other clothing, if not the person, of the wearer. This had been a serious difficulty to the success of metallic dress stays, and it had engaged the attention of not only Bray, the patentee, but as well of others, interested in overcoming it. Bray had, as early as 1881, sought to obviate the difficulty by reinforcing the ends of the pockets or covers of the stays with metallic tips of sufficient strength to resist the destructive action of the stay, but his invention, although a decided improvement, was not completely successful. Finally he made the improvement which is involved in this suit, and the result has been, as is shown by the testimony, that he has produced a popular, effective, and the least destructive substitute for the old and displaced whalebone stay which the trade has known.

And this is how he accomplished such result.   He says, referring to the drawings, here reproduced:

"At or near the ends of the twin steels, A, B, are circular complementary recesses, a, b. When the steels are within the covering, C, an eyelet, D, is inserted through the recesses and covering, and clamped, thus securing the steels in position within said covering. The eyelet fits the recesses snugly, so that there can be no displacement of the several parts of the stay. The recesses may be formed in the steels a short distance from the ends thereof, as shown in Figures 2 and 3 (of the patent), or said recesses may be formed within the ends of the steel, as shown at Figures 4 and 5, it being immaterial where the recesses are formed, so long as they are near the ends of the steel, so as not to interfere with the stitching of the stay within the garment."

The first claim of the patent, which is the only one which need be considered, is as follows:

"(1) In a dress stay, composed of twin steels within a suitable covering, the combination of the steels having circular complementary recesses, with an eyelet secured to the covering through said recesses, substantially as shown and set forth."

The main question to be considered is this:   Does this combination show patentable novelty in view of the state of the art, having especial regard to the invention of Augustine B. Curtis for an im-

provement in corsets, secured to him by letters patent No. 243,519, dated June 28, 1881? What is the invention of Curtis? He says that his invention relates "to an improvement in the back of corsets; that is to say, in the section at each of the rear edges, and in which the eyelets are placed for lacing. It is a common practice to place a bone or stay at the edge, and in rear of that stay to introduce the eyelets, the eyelets being arranged so that the strain (of the lacing) comes entirely on the fabric. The result is that the fabric soon yields, and the eyelets are easily detached. To obviate this difficulty, in some cases, a broad stay has been introduced, with perforations through the stay and fabric, and the eyelets inserted in said perforations; but this necessitates so broad a stay that the expense is too great for practical use, and, further, the large perforation in the center of the stay so weakens it that it breaks to such an extent that, aside from its cost, it is impracticable." The object of this invention is to overcome this difficulty, and it consists in the construction as hereinafter described, and particularly recited in the claim.

Fig. 1 and Fig. 2 represent the invention, as follows:

—and the patentee thus describes it:

"I first make a stay, A, of metal, and upon one edge cut a series of notches, a, corresponding to the position where the eyelets, E, are to be introduced. This stay is introduced into a pocket, B, at the edge of the corset, and in rear of the pocket, B, a second pocket, C, is formed, into which a cord or other flexible stay is introduced, and distant from the edge of the stay, A, less than the diameter of the eyelet, as seen in Fig. 1, where a portion of the outer fabric is cut away to show the stays, A and D, in their proper relative position. The fabric is perforated at the notches, a, in the metal stay, and at the side of the flexible stay, D; then eyelets, E, introduced, and struck down onto the metal stay around the notches, and also on the flexible stay, as seen in Fig. 2. The metal stay forms a support to take the strain of the eyelets, and, being unyielding, firmly retains the eyelets, in their position. The flexible stay, D, gives a thickness at the opposite side of the eyelet corresponding to the metal stay, so that the eyelets will close firmly upon that edge. The stay, D, is here represented as a cord, but it will be understood that it is only necessary that it should be of such a character as to thicken the corset upon that side of the eyelets, so that the closing of the eyelets may be firm and strong upon the fabric; hence by the term 'stay, D,' I wish to be understood as including any thickening of the fabric upon that side of the eyelets. The fabric which forms the rear section extends beyond the stays in the shape of a double

flap, F, F, for attachment to the adjoining section. As these sections are straight, and of equal width from top to bottom, they may be made as an article of manufacture independent of the corset, and furnished to corset manufacturers to be attached to corsets, or to the wearer for the alteration or repair of corsets."

The only claim made is this:

"In the back section of a corset, a notched stay, A, introduced in a pocket at the rear edge, combined with a flexible stay at the side of the metal stay, and eyelets introduced through the fabric at the notches in the metal stay, and struck down around the respective notches and onto the flexible stay, substantially as described."

Even a casual reading of the specification and of the claim discloses the intent of the inventor. It was definite in its avowed purpose. The end to be accomplished was the providing of a sufficient and permanent support to the eyelet. The work of the metal stay was to bear the strain put upon the eyelet by the lacing cord, and, being unyielding in its nature and from its construction, with the eyelets used as rivets, not easily displaced, it retained the eyelet firmly in its position. It was the destructive strain upon an unsupported eyelet, and the necessary yielding to that strain by the eyelet, equally destructive to itself and to the fabric in which it was inserted, that demanded remedy from invention. Movement of the eyelet was the difficulty to be overcome. Curtis did overcome it, and made the eyelet immovable by clamping it to a metallic stay, rendered incapable of displacement by the eyelet itself. That clamping made it practically a component part of the stay, and it gathered to itself both the rigidity and immovability which characterized its supporting base and to which it clearly contributed. The vexatious problem had at last been solved.

From this brief statement of the design of the Curtis invention it seems very difficult to differentiate the Bray invention from it, to such a degree, at least, as would dignify the latter with inventive ability. Curtis sought to obtain immovability and rigidity of the elements with which he was dealing,—that is, the eyelet and the reinforcing stay,—and this he obtained by using a steel stay, properly notched, and fastened by an eyelet clamped through the notches in the steel upon the underlying fabric, holding the steel permanently to the fabric. Mr. Newbury, the expert witness for the defendant, in comparing the Curtis invention with the Bray invention uses the following words:

"Now, comparing the stay shown in this Curtis patent with the one shown in the patent in suit, I find that the stay of the Curtis patent is composed of an outer covering or fabric, in which there are pockets, formed parallel with each other. In one of these pockets a steel is inserted, said steel being provided with notches, or, as termed in the patent in suit, with 'complementary recesses,' and the outer covering is perforated opposite these complementary recesses or notches, and eyelets, which serve as rivets, are inserted, so that they form abutments or stops which prevent the longitudinal movement of the steel in the pocket. In this respect the stay of the said Curtis patent is identical with the stay shown in Figs. 1, 2, and 3 of the patent in suit. There is also the same co-action between the pocket, complementary recess, and eyelet or rivet of the stay of this Curtis patent that there is between the pocket, complementary recess, and eyelet of the patent in suit. In each case the eyelet occupies a portion of the space of the pocket, the complementary

recess permitting this, and affords an abutting surface to abut against the eyelet, and in this way prevent a displacement of the parts."

And this seems to be an impartial and just statement of the similarity between the two. The fact that the eyelet in the Curtis invention may be, and was primarily designed to be, used for the lacing cord, does not detract from the conclusion of this expert witness as to the practical identity of the two inventions. Such use is simply an additional function of the eyelet. It would in no manner modify or lessen the co-action of the stay, of its covering pocket, and of the eyelet in preventing displacement of the various component parts; for, whether the lacing cord be inserted through the eyelet or not, the immobility of the stay remains undisturbed. The action is reciprocal. The eyelet as a rivet secured the stay; the stay as a base secures the eyelet. Both from this reciprocal action become fixed and immovable. It is hardly necessary to say that, stripped of all technicalities, this alleged invention of Bray simply fixes in a receptacle prepared for it a steel stay by means of rivets (eyelets) driven through the stay and the covering fabric; that, and nothing more. But to obtain immobility by the use of rivets is certainly far removed from the domain of inventive thought. Given the stay as described by Curtis, surely a person of ordinary mechanical skill, seeing the effect of the riveting eyelet upon the metallic base, could produce the improvement which Bray accomplished. The same elements are in both; the action is not dissimilar; the use so nearly analogous that the applicability of the device to the alleged new use would occur to any one with ordinary mechanical skill. These things being so, the claim of invention vanishes.

But it is insisted by the complainant that the defendants are estopped from attacking now the validity of this patent. It is charged in the bill of complaint that on or about the 29th day of January, 1892, said Bray and your orator brought a suit in equity in the United States circuit court in and for the Second circuit and Southern district of New York against E. J. Denning et al., alleging infringement by them of said letters patent No. 440,246, by reason of their sale of the dress stays made by said Stewart, Howe & May. That thereupon the said Stewart, Howe & May assumed the defense of said suit, and, answer and replication being duly filed, testimony was taken at great length for both sides, and in due course the said cause came on to be heard at the April term, 1893 (56 Fed. 1019) of said court before the Honorable Hoyt H. Wheeler, who, after hearing counsel for both sides, and after due consideration, filed his decision therein in favor of the complainant in said suit, and thereafter a decree was duly entered therein, a certified copy whereof is hereto annexed, and made a part of this bill. It further appears that after this favorable judgment this cause was carried by appeal to the circuit court of appeals for the Second judicial circuit, and in an opinion there rendered (10 C. C. A. 7, 61 Fed. 652) it was declared: "As the record title to the patent is in the complainant, its validity in no way assailed, and infringement conceded, defendants can justify their dealing in the articles

only by showing that they had the right to sell them. This they seek to do by proving that Stewart, Howe & May manufactured the articles under a license;" and the judgment of the court was that the defendants had failed in this particular. And the insistment of the complainant is that from this judicial determination by the court arises an estoppel, operative against the present defendants, which bars their right to question the validity of the letters patent. It may be taken as settled that a judgment at law or in equity is a bar only as to the matters actually litigated, or which ought to have been litigated, in the suit; that is, the matters actually in issue are forever settled, so far as the parties and their privies are concerned. But further than this the principle of estoppel does not obtain. The "matters in issue" may be fairly well defined as "that ultimate fact or state of facts in dispute, upon which the verdict or finding is predicated." Smith v. Ontario, 4 Fed. 386. Now, the record in the case in New York shows very clearly that the validity of the letters patent here involved was, by the defendants there, not contested in any way. The defendants were charged, indeed, in that suit, with infringement, but, admitting the validity of the patent, they claimed a license to sell the stays in question from one who owned an interest in the patent. And this was the sole issue which was litigated. Indeed, a licensee having accepted a license is estopped from denying the validity of the patent in any suit in which the exercise of alleged license privileges is the basis of the controversy. Therefore the defendants were debarred from attacking in the New York suit the validity of these letters patent, even if they had been so minded. Admitting, then, that the defendants to the present suit took an active part in the defense of the suit in New York, as is alleged,— so active, indeed, as to bring themselves within the binding force and effect of any decree therein made,—it is evident that the only issue settled beyond peradventure was that which concerned itself with the alleged license. That this was the issue is expressly settled by the circuit court of appeals in its decree in these words: "The defendants having failed to make out the defense of license, the decree of the circuit court was correct, and judgment is affirmed, with costs." It seems clear, therefore, that the question of the validity of the letters patent was not litigated in the New York case. This being so, that decree is not an estoppel on the issue now presented for the first time. But, apart from this, the evidence on the part of the complainant does not satisfactorily show such a connection of the defendants in the present case with the suit in New York as would justify the invoking of the doctrine of estoppel. The testimony is conflicting, and evenly balanced, to say the least; and, as the burden is on the complainant, failure to sustain it must result in the failure of the allegations in this respect. The conclusion is that the defendants are not estopped from contesting the validity of the letters patent in this action by the decree of the court in New York.

Having found that the letters patent are invalid, it is not necessary to examine the status of the present title to them. It is

only necessary to say that whatever title the defendants may have clearly was taken by them with knowledge, actual or implied, of the rights of the complainant. The bill of complaint must be dismissed.